## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRADLEY CLARK, | : | CASE NO. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHOPIFY (USA) INC., | : | |
| | : | |
| Defendant. | : | OCTOBER 7, 2025 |

## COMPLAINT

## JURISDICTION AND VENUE

1.  This action arises under the Americans with Disabilities Act ("ADA") as amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 *et seq*; Connecticut General Statues; and Connecticut State Law.

2.  The jurisdiction of this court is founded upon 28 U.S.C. §1331 (federal question) and the provisions of 28 U.S.C. §1343.

3.  Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) in that the claims arose in this district.

4.  Supplemental jurisdiction over Plaintiff's supplemental state law claims is invoked pursuant to 28 U.S.C. §1367 as the claims arise out of the same transaction and occurrences as Plaintiff's federal claims.

5.  Costs, expert witness fees, and attorney's fees are sought pursuant to 42 U.S.C. §1988.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.    The Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission in Charge No. 16A-2024-01787 on September 25, 2025.

7.    Plaintiff received a Release of Jurisdiction from the Connecticut Commission on Human Rights and Opportunities in Charge No. 2520124 on July 15, 2025.

## PLAINTIFF

8.    The Plaintiff, Bradley Clark ("Plaintiff" or "Clark"), is a natural person and currently a resident of the City of Nashville and State of Tennessee.

9.    Plaintiff was a resident of the City of Stamford and the State of Connecticut during his employment with Shopify.

## DEFENDANT

10.    The Defendant, Shopify (USA) Inc., ("Defendant" or "Shopify"), is a Delaware corporation, headquartered at 148 Lafayette Street, New York, New York, 10013, that conducts substantial business within the State of Connecticut, and employed remote employees, including Clark.

11.    Defendant employs more than fifteen (15) employees.

## FACTUAL ALLEGATIONS

### A. CLARK'S EMPLOYMENT WITH SHOPIFY

12.    Clark has a history of Generalized Anxiety Disorder ("GAD"), Depression, and Attention Deficit/Hyperactivity Disorder ("ADHD.")

13.    Clark began working for Shopify in July 2023.

14.    Clark was hired as a Senior Account Executive - Large Accounts.

15. During his employment with Shopify, Clark was a remote employee working from his home in Stamford, Connecticut.

16. Clark's on-target earnings included 60% for salary, totaling $146,300, and 40% for commissions, totaling $97,400, for a grand total of $243,700.

17. When hired, Shopify advised Clark that his position was classified as "exempt" under the applicable wage laws, but this was in error.

18. In fact, pursuant to the applicable wage laws, Clark would be classified "non-exempt" as an "outside sales employee."

19. Non-exempt employees are entitled to time and a half their normal pay rate for any hours worked over forty (40) hours per week.

20. Clark routinely worked over forty (40) hours per week throughout the entirety of his employment.

21. Clark was not paid for any hours worked over forty (40) hours per week while employed by Shopify.

22. On Monday, January 8, 2024, Clark's supervisor, East Sales Coach Mario Edwards ("Edwards"), asked Clark during the weekly East Team Meeting whether Clark could go to the National Retail Foundation ("NRF") event in New York City on Monday, January 15, 2024.

23. This was the first time Edwards dove deeper into the plan regarding NRF on a call with his East Team.

24. Clark was excited about the opportunity and asked during the team meeting what the East's plan was for NRF.

-3-

25.    At that time, Edwards did not have a clear agenda, plan, or confirmation of attendance for NRF.

26.    Clark's Teammate, Senior Account Executive Gabriella Santi ("Santi"), was planning on attending but advised Edwards during the East Team Meeting that she could not go.

27.    Santi recommended that Clark attend if he could rearrange his schedule at the last minute.

28.    Santi advised Clark that attending NRF would be a great learning experience.

29.    Edwards advised Clark during the Team Meeting that Edwards would reach out to Shopify's NRF Event Person Jacquie (last name unknown, "Jacquie") to obtain a ticket to the event for Clark.

30.    That evening, Clark received a calendar invite for an NRF training on Saturday, January 13, 2024.

31.    At this time, Clark and his Teammate, Senior Account Executive Allyssa Wickens ("Wickens"), were the only two members of the Edwards East Team who were going to NRF.

32.    Clark had a personal conflict and could not attend the Saturday training.

33.    On January 9, 2024, Clark sent a message to Edwards and Wickens in a group chat advising them that he could not attend the Saturday training and that he was coming in for the day on Monday, January 15, 2024.

34.    Edwards responded, "Okay - thanks for the heads up. We should be getting our hotel reservation info later this week."

35.    Clark advised Edwards that he was taking the train into New York City for the day and that a hotel room wasn't necessary as Clark was only coming in for the day.

36.    Edwards responded, "Perfect."

37.    Clark sent out a calendar invite on the morning of Wednesday, January 10, 2024, to Wickens, Edwards, & Teammate Solution Engineer Callum Mayer ("Mayer") entitled "NRF Plan" as the organization, communication, and plan by Edwards were lacking.

38.    Clark confirmed on this call he was coming in for the day on Monday, January 15, 2024.

39.    Edwards acknowledged that Clark would be at NRF on Monday, January 15, 2024.

40.    On January 11, 2024, Edwards' supervisor, Head of Large Accounts Ricky Ho ("Ho"), asked anyone who couldn't make the training on Saturday to message him and let him know.

41.    Clark contacted Ho directly to advise that he had a conflict on Saturday and that he had just received the invite a few days ago for the training on Saturday, January 13, 2024.

42.    Ho was surprised that Clark hadn't known about the training for weeks.

43.    Ho insisted that Clark attend the training.

44.    On Friday, January 12, 2024, Ho asked Edwards why Clark was not attending the Saturday training.

45.    Edwards sent Clark a text message advising Clark that he was chatting with Ho and wanted to make sure that they had their "story straight."

46.    Clark told Edwards that he had personal plans.

-5-

47.   Edwards told Clark that they were "aligned" and that he told Ho that Clark had a family obligation.

48.   Clark was uncomfortable that Edwards lied to Ho.

49.   Clark ended up canceling his plans and attended the Saturday training.

50.   During the late afternoon training on Saturday, January 13, 2024, Clark received a calendar invite for booth duties on Tuesday, January 16, 2024.

51.   On or around Saturday, January 13, 2024, Wickens advised Edwards that she couldn't attend NRF on any day because she was ill.

52.   Clark was the only member of Edwards' team to attend Training and NRF.

53.   Edwards was the only person from the Large Accounts Segment attending NRF who was absent from the Saturday training.

54.   After training on Saturday, January 15, 2024, Clark messaged the NRF Group Channel, which included Mayer, Wickens, Ho, and Edwards, to see if there was confirmation on which Account Executives ("AEs") were attending the Large Accounts customer dinner on Monday, January 15, 2024.

55.   Clark confirmed that his customers, the CTO/Co-Founder of Gainful and the President of Natori, would attend the dinner on January 15, 2024.

56.   Clark did not receive confirmation for which AEs were attending the Large Accounts Dinner from Shopify.

57.   On Sunday, January 14, 2024, Clark received no contact from Edwards until late that evening.

THE MCMINN EMPLOYMENT LAW FIRM, LLC

58.    On Sunday, January 14, 2024, at 8:23 pm, Clark received a text message from Edwards stating, "Just getting into Town. I'll be at NRF tomorrow at 9 am. How was NRF Today?"

59.    Clark responded that training was good yesterday and asked about Edwards' plans for Monday.

60.    Edwards asked Clark what had happened on Sunday and told Clark that everyone was manning the booth every day, noting that NRF was a big investment by the company and that senior leadership was present.

61.    Clark asked Edwards, "Was it a requirement for him to come to NRF on Sunday, January 14th?"

62.    Mario responded, "Yes, withstanding a family obligation. It's a requirement for us to come every day."

63.    Clark was shocked by this, as he had already communicated his plan to Edwards on January 12, 2024, that he was only coming in for the day on Monday, January 15, 2024.

64.    Clark sent Edwards a screenshot of their earlier conversation, which advised Edwards that Clark would only be attending on Monday, noting that Edwards confirmed his attendance for Monday.

65.    Clark told Edwards he was concerned about the poor communication and planning related to NRF, since Clark was officially confirmed to attend the event only earlier in the same week, on January 9, 2024.

66.    Clark said that if he had been required to attend on Sunday, Edwards should have told him so when Clark had sent over his plan.

67. Clark thought he was doing everything he was supposed to.

68. Clark told Edwards, "I gave up my Saturday for training, and getting texted late Sunday about how I was required to be there today - isn't fair."

69. Edwards messaged Clark, "We can talk more in person tomorrow. With Gabby [ Gabby Santi, "Santi"] not going, it changed things."

70. Clark sent Edwards a text message, advising him that he was frustrated for getting "beat up" about not attending, despite his sacrifices for the company's last-minute demands.

71. Clark advised Edwards that he learned about the requirements and what to do at the Saturday training.

72. Edwards told Clark that they would huddle in the morning to discuss details about the overall planning and what would have to be done that week.

73. Clark was shocked that Edwards said, "We can discuss in the morning what we have to do this week," as Edwards did not attend the Saturday training.

74. Clark advised Edwards "how upsetting this whole exchange was to him"

75. On Sunday evening, Clark had a panic attack from his exchange with Edwards.

76. Clark began crying, pacing around the streets of his residence, and had difficulty sleeping.

77. On Monday, January 15, 2024, Clark woke up early to take the train into NYC despite the stress Clark had just endured with attending the training on Saturday, January 13, 2024, at the last minute and despite the panic attacks Clark endured as a result of the text exchange with Edwards on Sunday, January 14, 2024.

78.     On Monday, January 15, 2024, Clark took the train into New York City to attend NRF.

79.     Edwards asked Clark to take over Edwards' booth duties from 9 am to 11 am.

80.     Edwards did not meet with Clark to go over the plan and duties for the week.

81.     Ho messaged the NRF group channel late in the morning and advised that they still have not confirmed which AEs will attend the Large Accounts Customer Dinner.

82.     Around 3 pm, Mayer asked Clark if he had word yet if he was attending the dinner.

83.     Clark advised that he still hadn't got a seat confirmation and needed to know soon so that he could make plans for his dog's care.

84.     Mayer was frustrated for Clark.

85.     At 5 pm, Clark still had not received word if there was an opening for him to attend the dinner.

86.     Clark messaged the NRF group channel, which included Ho, Edwards, Wickens, Mayer, and others, that he couldn't wait any longer and that his pre-arranged dog sitter could not wait around to see if Clark would attend the dinner.

87.     Clark sent a comprehensive prep document for his customers attending the dinner to the NRF group channel to prepare anyone who may interact with his and Mayer's clients that evening.

88.     Clark rushed to Grand Central to take a train home.

89.     Upon arrival at his house, Clark found that his dog had defecated on the floor.

90.     On January 16, 2024, Clark woke up feeling ill with increased stress, shaking, fever, and difficulty breathing, and saw that a blizzard had occurred overnight, which would cause him a substantial delay in commuting to NRF.

91.    Around 7am, Clark sent a message to Jacquie that he would not be able to make it to NRF.

92.    Jacqui told Clark she appreciated the heads up and that it wasn't a big deal.

93.    That morning, Edwards sent Clark a text message to ask if he was available "in 10 to give the low down from the dinner last night."

94.    Clark told Edwards that he was sick, but that Edwards could email a recap to him.

95.    At 1:05 pm, Clark texted Edwards asking if he had approved Clark's paid time off ("PTO") request from January 22, 2024, to February 5, 2024, as it had been in Edwards' approval queue since January 2, 2024.

96.    At 2:07 pm, Edwards sent Clark an email titled "Coaching feedback."

97.    Edwards coaching feedback included comments and steps relating to Getting Onsite and updating Next Steps.

98.    Edwards referenced Gainful as an outdated Next Step, despite the CTO of Gainful's attendance at the NRF Large Accounts dinner with Edwards, Mayer, and Ho the previous night.

99.    Clark's Next Steps were out to date for the week of January 15, 2024, as Clark attended NRF at the last minute on Saturday, January 13, 2024, and Monday, January 15, 2024.

100.   Clark informed Edwards that he was out sick before Edwards' "Coaching Feedback" email, so Clark was unable to update the next steps for the current week.

101.   Edwards stated in the Coaching Feedback email, "One of things that stands out about your current deal management playbook is lack of on-site meetings," referencing Gainful & Natori.

102.    Clark was shocked by this, as Clark would have 2 on-sites logged for Natori and Gainful if Edwards had approved Clark to attend the dinner the previous night.

103.    Clark had to certify that he wanted to work remotely for his daily work before submitting an application for the for the Senior Account Executive - Large Accounts position at Shopify.

104.    As a remote employee, Clark was not required to attend on-sites.

105.    Despite this, Clark logged more than 15 on-site meetings in the previous two months.

106.    Clark was one of the only AEs in the Large Accounts Segment that held a Micro-Event in the 4th Quarter of the Fiscal year (Q4) on November 30, 2023, in Philadelphia, PA.

107.    Clark's event had more than fifteen prospective customers in attendance.

108.    During his employment, Clark consistently ranked #1 for each month in activity on the East Team.

109.    Clark had no opportunity to update information from the client's sales dinner the previous night because he had not attended the dinner and was out sick that day.

110.    After Edwards sent the Coaching Feedback email, Edwards approved Clark's PTO.

**B.  CLARK DISCLOSES HIS DISABILITY AND FILES A REPORT OF HARASSMENT WITH HUMAN RESOURCES**

111.    After receiving the coaching feedback email, Clark replied to Edwards, copying Ho, and challenged Edwards' false coaching feedback, as well as Edwards' insufficient communication and planning for NRF.

112.    In his response, Clark told Edwards and Ho that Edwards had caused him mental stress that likely contributed to his illness that day.

113.    At 10am on Thursday, January 18, 2024, Edwards rescheduled a 10:30 a.m. team meeting to 4:30 pm, with the note, "Need to move this out until later in the day—hope everyone can join."

114.    At 10:48 a.m., Edwards emailed Clark a recap of NRF that included, "Gainful—I know what is going on there & Natori—The next step is for him to select an Agency."

115.    Clark was confused by this NRF Recap email, as the coaching feedback email Edwards sent on January 16, 2024, referenced incomplete Next Steps with Gainful and Natori.

116.    However, in the NRF recap email on January 18, 2024, Edwards updated Clark on the opportunities and advised that he knew what was happening for both clients.

117.    Clark declined the 4:30 pm team meeting invitation, as he was still unwell.

118.    Edwards questioned Clark about Clark declining the invitation.

119.    Clark told Edwards that he declined the meeting because he was sick and that Edwards changed the meeting that was originally scheduled for 10:30 am at the last minute to 4:30 pm.

120.    Edwards cited in the last minute reschedule, "Need to move this to later in the day - hope everyone can join"

121.    Clark told Edwards that he was sick on Tuesday, January 16, 2024, because of the mental stress and abuse from Edwards.

122.    Clark notified Edwards that he had a medical condition that interfered with his ability to perform his duties.

123.    Clark told Edwards that he was disturbed by this exchange as well as how Edwards continued to handle the situation and act towards Clark.

124.    Clark escalated this exchange with Edwards to Ho.

125.    On Friday, January 19, 2024, Edwards scheduled a meeting with Clark for 10:00 am, which Clark declined because he was still sick.

126.    After Clark declined, Edwards messaged Clark, saying, "I was hoping to connect."

127.    Clark told Edwards that he would not be available to meet as he was sick.

128.    Clark advised Edwards that he would be managing all deals that were expected to close in the next two to three weeks while on PTO and would send Edwards a detailed update on the deals.

129.    Edwards messaged Clark after this exchange, "As your Coach, it's important for me to understand the latest….Given that you have time on your calendar today for 2:30 pm."

130.    Edwards then sent another calendar invite to Clark for 2:30 pm after Clark declined the first one and informed Edwards that he was sick.

131.    Clark declined the second calendar invite, advising Edwards that he was still sick.

132.    Clark advised Edwards that he was not meeting with Edwards and that, "I am in bed & sick…Let me rest and get better…stop berating me."

133.    Clark told Edwards that he would email a recap about three deals that he was working on so that Edwards would be updated on Clark's pending deals.

134.    Clark sent Edwards the email summary promised earlier.

135.    Edwards rescheduled Clark's and Edwards' ongoing series of one-on-one meetings from its regularly scheduled day and time to Mondays at 8:30 am.

136.    Edwards' and Clark's one-on-one series had been scheduled for the same day and time since Clark began his employment.

137.    Edwards asked Clark to accept the new time series for Mondays.

138.    On Sunday, January 21, 2024, Clark sent an email to Edwards and Ho, complaining that Edwards engaged in harassing behavior after Clark told him that he was sick.

139.    Clark noted that he had never taken sick days or PTO before the week of January 15, 2024, that he was mentally unwell, and became sick because of Edwards' behavior.

140.    Clark reported that Edwards violated Shopify's Code of Conduct and Anti-Harassment policy by harassing and bullying Clark, which included not taking Clark's sickness and disability seriously, and that Edwards lied to both Ho and Clark.

141.    On Monday, January 22, 2024, Clark began two weeks of PTO and was scheduled to return on Monday, February 5, 2024.

142.    On Monday, January 22, 2024, Clark spoke with Wickens.

143.    Wickens had witnessed Edwards's behavior toward Clark.

144.    Wickens recommended that Clark submit a formal HR Case against Edwards.

145.    Wickens provided Clark with contact information for Alyssa Kanj ("Kanji") in employee relations, who Wickens cited as a good person for Clark to contact.

146.    Clark created a timeline with evidence and submitted a formal HR Case via Shopify's internal systems for Edwards' Harassment, disrespect of Clark's

disability, and violation of Shopify's Code of Conduct and Anti-Harassment policies.

147.    Clark reached out to Kanji and shared the case submission for her to review ("HR Case.")

148.    The HR Case was routed to HR Business Partner Isabel Carvallo Torres ("Torres.")

149.    On January 23, 2024, Clark sought mental health treatment at Greenwich Hospital's Behavioral Health Center.

150.    During his appointment, Clark reported anxiety and other symptoms that peaked during high-stress situations, which included meeting with his supervisor.

151.    During his time off from work, Clark also met with his Chiropractor, who noticed signs of anxiety and stress in Clark.

152.    During Clark's PTO, Kanji reached out for time to interview Clark about the incident.

153.    On January 30, 2024, Kanji called Clark to follow up on his report about Edwards behavior and asked some follow-up questions.

154.    During the call, Clark asked about the plan for Edwards and him as Clark didn't feel comfortable speaking to Edwards.

155.    Kanji advised she would speak with Torres and Ho to discuss a plan for Clark and Edwards.

156.    On January 31, 2024, Clark signed and closed the Gainful Deal.

157.    After Clark had completed the deal, Torres told Clark she had spoken with Ho and that Ho would be having one-on-ones with Clark for the foreseeable future.

158.   Clark declined an ongoing series of one-on-ones with Edwards, advising Edwards that the meetings were declined per HR's feedback.

159.   Santi texted Clark, "I wanted to chat about Mario with you. Totally on your side here…I'm so sorry that it's been so stressful for you. That's not ok, and I want to help"

160.   On February 5, 2024, Clark returned to work full-time.

### C. CLARK WAS RETALIATED AGAINST AND UNJUSTLY TERMINATED

161.   On February 8, 2024, Kanji called Clark to tell him that his HR report had been closed as unfounded.

162.   On February 8, 2024, Kanji notified Edwards that the HR complaint against him had been closed as unfounded.

163.   The February 8, 2024 email stated, "As you know, everyone who engages in this process is entitled to be free from negative reprisal for bringing forward their concerns. Should you experience any negative repercussions as a result of your involvement in this process, we ask that you please let us know as soon as possible."

164.   After Clark's HR case was closed, Edwards retaliated against Clark.

165.   Edwards failed to recognize Clark for closing the January 31, 2024, deal with a deal write-up in the AMER Large Accounts Slack channel, as Edwards had done for all other closed deals.

166.   On February 8, 2024, Ho sent Clark a calendar invitation for a meeting on February 9, 2024.

167.    Clark asked Ho about the meeting, and Ho explained that it was a one-on-one meeting to discuss any feedback from Ho or Clark.

168.    Clark told Ho that he was not in a good place right now.

169.    Ho told Clark that they would reschedule the meeting.

170.    Clark disclosed that he was planning on seeing his doctor on February 9, 2024, and would not be able to attend a separate meeting on that day and would be out sick unless otherwise noted.

171.    Ho acknowledged Clark's appointment and told him that he hoped Clark felt better, then asked Clark to share his absence with Edwards directly.

172.    Clark was confused by this, as HR previously advised him that Ho would be having 1 on 1s for the foreseeable future because Clark didn't feel comfortable engaging with Edwards.

173.    Ho then forwarded Clark's email to Edwards and Torres, to advise them of Clark's absence.

174.    On February 9, 2024, Edwards canceled the New Hires Series Enablement for Clark.

175.    On February 9, 2024, Torres sent Clark information about Shopify's Employee Assistance Program, Modern Health, and Short-term Disability Leave, stating, "We understand the importance of taking care of your physical and mental health."

176.    Clark's doctor appointment was rescheduled to February 13, 2024.

177.    On February 11, 2024, Clark forwarded the meeting series cancelation to Torres and Ho to inform them that Edwards removed Clark from the New Hires Series,

sending a screenshot showing Clark removed the next session on February 21, 2024, and the remainder of the series.

178.   The New Hire series participation was only canceled for Clark.

179.   Edwards did not cancel the New Hire series participation for others who started on or near Clark's start date.

180.   On February 11, 2024, Clark reported Edwards actions as retaliation.

181.   On February 13, 2024, Clark met with his psychiatrist and discussed taking short-term disability leave with his provider.

182.   Clark continued medical treatment while on leave and his provider increased Clark's medication.

183.   On February 15, 2024, Torres asked Clark when Clark would return to work.

184.   Clark advised Torres that he would return on February 20, 2024.

185.   Clark asked Torres for an accommodation for his disability by questioning how Shopify would conduct his supervision upon his return.

186.   Torres told Clark that she would connect with Ho and that she would discuss the plan for Clark and Edwards when Clark returned to work.

187.   On February 15, 2024, after Clark's interaction with Torres, Clark messaged Ho to advise him that he would return on February 20, 2024, and requested an accommodation for his disability.

188.   Clark requested that he meet with Ho before engaging with Edwards.

189.   Ho advised that he would be out of the office the following week and that Torres would contact Clark on Tuesday, February 20, 2024, as Clark did not want to engage with Edwards yet.

-18-

190.    On February 16, 2024, Ho messaged Clark, thanking him for being open and honest about his reluctance to speak with Edwards.

191.    Ho advised again that he would have a member of the HR Team contact Clark the week of February 20, 2024, to check in and see how he is doing.

192.    On February 20, 2024, Clark returned to work.

193.    That morning, HR Business Partner Surbhi Sharma ("Sharma") added a meeting on Clark's calendar for 10:45 am.

194.    Clark sent Sharma a message inquiring about the reason for the meeting.

195.    Sharma was vague and refused to tell Clark the reason for the meeting.

196.    Clark joined the meeting at 10:45 a.m.

197.    Once he joined, Torres, who was not on the meeting invitation, joined the meeting.

198.    During the February 20, 2024, call, Torres advised that Clark's employment was terminated.

199.    Clark was terminated on his first day back from medical leave after his HR case was closed.

200.    During the meeting, Torres and Sharma told Clark that he was being terminated for performance.

201.    Prior to his termination, Clark was in the top five for revenue booked across the Large Accounts segment for the new Fiscal Year that began on January 1, 2024.

202.    Prior to his termination, Clark had three additional deals in a "commit" stage, and the last possible stage of the pipeline that was slated to be booked before the end of the first quarter, in March 2024.

203.    Shopify also alleged that Clark failed to attend on-site meetings.

204.    Shopify's allegation about Clark's failure to attend on-site meetings was false.

205.    Clark was not required to attend on-site meetings.

206.    Clark led his team in activity.

207.    Shopify's stated reason for termination is false.

208.    Shopify's stated reason for termination is pretext for discrimination and retaliation.

209.    Shopify's stated reason for termination is pretext for interfering with Clark's right to take additional protected medical leave.

210.    Shopify's stated reason for termination is pretext for denying Clark an accommodation for his disability.

211.    Shopify did not engage in an interactive process after Clark asked Torres for accommodations on February 15, 2024.

212.    Shopify did not engage in an interactive process after Clark asked Ho for accommodations on February 15, 2024.

213.    Shopify did not engage in an interactive process after Clark's consistent reports of not being in a good place, being mentally unwell, and having panic attacks, that were caused by Edwards.

214.    After Clark's termination, Clark continued to suffer from anxiety, depression, panic attacks, and was diagnosed with PTSD, Psychophysiological Insomnia, Insomnia due to anxiety and fear, Parasomnia, Obesity, and gastrointestinal problems that his providers determined was attributed to Clark's "abrupt firing from work."

215.    Shopify failed to pay Clark his final paycheck on his termination date or the following business day.

216.    As a result of his termination, Clark has suffered damages.

## COUNT ONE

### DISABILITY DISCRIMINATION,
### IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
### 42 U.S.C. § 12101 et seq.

217.   The Plaintiff hereby re-alleges and reincorporates paragraphs 1-216 with the same force and impact as if fully set forth herein.

218.   Plaintiff was diagnosed with Generalized Anxiety Disorder ("GAD"), Depression, and Attention Deficit/Hyperactivity Disorder ("ADHD.").

219.   Plaintiff's medical conditions substantially limited one or more of his major life activities, including but not limited to working.

220.   Plaintiff has a record of his medical condition.

221.   Plaintiff is disabled.

222.   Plaintiff notified Defendant of his medical conditions.

223.   Defendant perceived Plaintiff to be disabled.

224.   In the alternative, Defendant perceived Plaintiff to have a mental impairment.

225.   Plaintiff was at all times qualified for the position he held.

226.   Defendant subjected Plaintiff to a hostile work environment.

227.   Defendant knew of discriminatory statements and actions made by Defendant's management and employees.

228.   Defendant took no corrective action to management and employee discrimination.

229.   Defendant permitted a hostile work environment toward Plaintiff.

230.   Defendant subjected Plaintiff to disparate treatment, including but not limited to, issuing false coaching feedback within an hour of Clark requesting PTO, sending Clark multiple calendar invites despite knowing that Clark was ill and unable to

attend, removing only Clark from the new-hire enablement series after Clark stated that he was planning on going to the hospital, denying Clark's request for reasonable accommodation, and terminating him upon his return from sick leave.

231.   Plaintiff suffered adverse employment actions, including, but not limited to terminating Plaintiff's employment.

232.   Defendant's conduct violated 42 U.S.C. § 12101 et seq. by discriminating against Plaintiff, retaliating against Plaintiff, failing to accommodate Plaintiff, subjecting Plaintiff to disparate treatment on the basis of disability, and terminating Plaintiff's employment.

233.   As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

234.   Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT TWO

### DISABILITY DISCRIMINATION – FAILURE TO ACCOMMODATE, IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 et seq.

235.   The Plaintiff hereby re-alleges and reincorporates paragraphs 1-234 with the same force and impact as if fully set forth herein.

236.   Plaintiff requested reasonable accommodations for his disabilities, including but not limited to time off work to seek medical treatment and a change in supervision.

237.   Plaintiff's requested reasonable accommodations would not have caused Defendant an undue hardship.

238.  Plaintiff's request for reasonable accommodation was medically necessary.

239.  Defendant failed to engage in an interactive process to determine accommodations for Plaintiff.

240.  Defendant denied Plaintiff's request for reasonable accommodations.

241.  Defendant retaliated against Plaintiff for requesting reasonable accommodations.

242.  Defendant's conduct violated 42 U.S.C. § 12101 et seq. by discriminating against Plaintiff, retaliating against Plaintiff, failing to accommodate Plaintiff, subjecting Plaintiff to disparate treatment on the basis of disability, and terminating Plaintiff's employment.

243.  As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

244.  Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT THREE

### DISABILITY RETALIATION
### IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
### 42 U.S.C. § 12101 et seq.

245.  The Plaintiff hereby re-alleges and reincorporates paragraphs 2-244 with the same force and impact as if fully set forth herein.

246.  The Plaintiff participated in protected activities by requesting disability accommodations.

247.  Defendant retaliated against Plaintiff by, including but not limited to, issuing false coaching feedback within an hour of Clark requesting PTO, sending Clark multiple

-23-

calendar invites despite knowing that Clark was ill and unable to attend, removing only Clark from the new-hire enablement series after Clark stated that he was planning on going to the hospital, denying Clark's request for reasonable accommodation, and terminating him upon his return from sick leave. Among the factors that motivated Defendant's actions were Plaintiff's disabilities.

248. Defendant's conduct violated 42 U.S.C. § 12101 et seq. by discriminating against Plaintiff, retaliating against Plaintiff, failing to accommodate Plaintiff, subjecting Plaintiff to disparate treatment on the basis of disability, and terminating Plaintiff's employment.

249. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

250. Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT FOUR

### DISABILITY DISCRIMINATION,
### IN VIOLATION OF CONN. GEN. STAT. § 46A-60(b)(1)

251. The Plaintiff hereby re-alleges and reincorporates paragraphs 1-250 with the same force and impact as if fully set forth herein.

252. Plaintiff was diagnosed with Generalized Anxiety Disorder, Depression, and Attention Deficit/Hyperactivity Disorder.

253. Plaintiff's medical conditions substantially limited one or more of his major life activities, including but not limited to working.

254.    Plaintiff has a record of his medical condition.

255.    Plaintiff is disabled.

256.    Plaintiff notified Defendant of his medical conditions.

257.    Defendant perceived Plaintiff to be disabled.

258.    In the alternative, Defendant perceived Plaintiff to have a mental impairment.

259.    Plaintiff was at all times qualified for the position he held.

260.    Defendant subjected Plaintiff to a hostile work environment.

261.    Defendant knew of discriminatory statements and actions made by management and employees.

262.    Defendant took no corrective action to management and employee discrimination.

263.    Defendant permitted a hostile work environment toward Plaintiff.

264.    Defendant subjected Plaintiff to disparate treatment, including but not limited to, issuing false coaching feedback within an hour of Clark requesting PTO, sending Clark multiple calendar invites despite knowing that Clark was ill and unable to attend, removing only Clark from the new-hire enablement series after Clark stated that he was planning on going to the hospital, denying Clark his request for reasonable accommodation, and terminating him upon his return from sick leave. Plaintiff suffered adverse employment actions, including, but not limited to terminating Plaintiff's employment.

265.    As such, Defendant's actions and conduct are a violation of Conn. Gen. Stat. § 46a-60(b)(1).

266.    As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health

insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

267.    Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT FIVE

### DISABILITY DISCRIMINATION – FAILURE TO ACCOMMODATE, IN VIOLATION OF CONN. GEN. STAT. § 46A-60(b)(1)

268.    The Plaintiff hereby re-alleges and reincorporates paragraphs 1-267 with the same force and impact as if fully set forth herein.

269.    Plaintiff requested reasonable accommodations for his disabilities, including but not limited to time off work to seek medical treatment and a change in supervision.

270.    Plaintiff's requested reasonable accommodations would not have caused Defendant an undue hardship.

271.    Plaintiff's request for reasonable accommodation was medically necessary.

272.    Defendant failed to engage in an interactive process to determine accommodations for Plaintiff.

273.    Defendant denied Plaintiff's request for reasonable accommodations.

274.    As such, Defendant's actions and conduct are a violation of Conn. Gen. Stat. § 46a-60(b)(1).

275.    As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

276.    Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT SIX

**DISABILITY RETALIATION
IN VIOLATION OF CONN. GEN. STAT. § 46A-60(b)(4)**

277.     The Plaintiff hereby re-alleges and reincorporates paragraphs 1-276 with the same force and impact as if fully set forth herein.

278.     The Plaintiff participated in protected activities by requesting disability accommodations.

279.     Defendant retaliated against Plaintiff by, including but not limited to, issuing false coaching feedback within an hour of Clark requesting PTO, sending Clark multiple calendar invites despite knowing that Clark was ill and unable to attend, removing only Clark from the new-hire enablement series after Clark stated that he was planning on going to the hospital, denying Clark's request for reasonable accommodation, and terminating him upon his return from sick leave. Among the factors that motivated Defendant's actions were Plaintiff's disabilities.

280.     As such, Defendant's actions and conduct are a violation of Conn. Gen. Stat. § 46a-60(b)(4).

281.     As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

282.     Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT SEVEN

### FAILURE TO PAY WAGES UPON TERMINATION,
### IN VIOLATION OF CONN. GEN. STAT. § 31-72

283.   Plaintiff realleges and incorporates by reference the allegations made in Paragraphs 1-282, with the same force and impact as if fully set forth herein.

284.   Pursuant to Conn. Gen. Stat. § 31-71c(b), "whenever an employer discharges an employee, the employer shall pay the employee's wages in full not later than the business day next succeeding the date of such discharge."

285.   February 20, 2024, Defendant discharged Plaintiff by terminating his employment.

286.   Defendant did not issue Plaintiff his final pay on February 20, 2024.

287.   Defendant did not issue Plaintiff his final pay on February 21, 2024.

288.   Defendant did not have a good faith belief that its failure to pay Plaintiff within explicit statutory guidelines was in compliance with the law.

289.   Defendant failed to issue Plaintiff his final pay not later than the business day next succeeding the date of her termination.

290.   Plaintiff's failure to immediately object to Defendant's failure to issue Plaintiff his final pay did not waive or otherwise offer consent to Defendant's violation of Conn. Gen. Stat. § 31-71c(b).

291.   Defendant failed to pay Plaintiff until February 29, 2024.

292.   As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages and earned fringe benefits.

293.   Plaintiff seeks statutory liquidated damages, costs, and attorney's fees for Defendant's misconduct.

## COUNT EIGHT

### VIOLATION OF THE FAIR LABOR STANDARDS ACT

294.    Plaintiff realleges and incorporates by reference the allegations made in Paragraphs 1-293, with the same force and impact as if fully set forth herein.

295.    During all times material to this Complaint, Plaintiff was not exempt from receiving minimum wage under the FLSA because, *inter alia*, he was not an "executive," "computer," "administrative," "professional," or "outside sales" employee, as those terms are defined under the FLSA. See 29 C.F.R. §§ 541.0, et seq.

296.    During all times material to this Complaint, Plaintiff was not subject to what is commonly known as the "Motor Carrier Act Exemption" because, inter alia, the vehicle he operated had a Gross Vehicle Weight of 10,000 lbs. or less. See 29 U.S. Code § 213(b)(1).

297.    During all times material to this Complaint, Plaintiff was not exempt from receiving FLSA overtime benefits under the commonly-called "companionship exemption" because, inter alia, they did not work in a "private home," as contemplated by the FLSA. *See* 29 U.S.C. § 213(b)(15) and 29 C.F.R. § 552.1, et seq.

298.    During all times material to this Complaint, Defendant violated the FLSA with respect to the Plaintiff by, *inter alia*, failing to compensate him at time-and-one-half their regular rates of pay for any hours worked in excess of forty (40) hours per workweek.

299.    During all times material to this complaint, Defendant knew that Plaintiff was not exempt from the minimum wage and overtime obligations imposed by the FLSA. Defendant also knew that they were required to pay Plaintiff at least the applicable

-29-

minimum wage, plus overtime compensation at a rate of one and one-half their respective regular rates for hours worked in excess of forty (40) hours per workweek. Despite such knowledge, Defendant willfully withheld and failed to pay overtime compensation to which Plaintiff was entitled.

300. In violating the FLSA, Defendant acted willfully, without a good faith basis and in reckless disregard of clearly applicable FLSA provisions.

301. As a direct and proximate cause of Defendant's conduct, pursuant to 29 U.S.C. § 216(b), Defendant is liable to Plaintiff for the full amount of the required overtime compensation for hours which he worked in excess of forty hours per workweek, an additional equal amount as liquidated damages as well as costs and reasonable attorney fees.

**PRAYER FOR RELIEF**

Wherefore the Plaintiff prays that this court award:

1. Money damages;

2. Costs;

3. Punitive damages, attorney fees, and expert witness fees;

4. Pre-judgment interest

5. Trial by jury; and

-30-

6. Such other relief as the Court deems just, fair, and equitable.

THE PLAINTIFF,
BRADLEY CLARK

By: */s/Michael C. McMinn*
    Michael C. McMinn (#*ct27169*)
    Angela Rodriguez (ct31850)
    **THE MCMINN EMPLOYMENT**
    **LAW FIRM, LLC**
    1000 Lafayette Blvd., Suite 1100
    Bridgeport, CT 06604
    Tel: (203) 683-6007
    Fax: (203) 680-9881
    michael@mcminnemploymentlaw.com
    angela@mcminnemploymentlaw.com

    COUNSEL FOR PLAINTIFF